[Civil No. 1877.   Filed May 4, 1921.]

[197 Pac. 575.]

# J. W. SULLIVAN, Appellant, v. W. E. GIRD, Appellee.

1. SALES—DELIVERY ACCORDING TO CONTRACT IMPERATIVE.—The seller must deliver in accordance with the contract terms, and a delivery by any other means or through any other agency than the one agreed upon entitles the vendee to repudiate the sale if he so elect, and any loss or damage to the goods in transit in such circumstances is the vendor's, so that, where seller of cows did not deliver them at the shipping point agreed, he was not entitled to recover the purchase price of one cow which died in transit before delivery at point of destination, where the buyer accepted delivery.

2. SALES—TITLE TO CATTLE NOT DELIVERED AT PLACE CONTRACTED FOR REMAINED IN SELLER UNTIL BUYER'S ACCEPTANCE OF THEM.— Where cattle were not delivered to the buyer at the railroad shipping place agreed upon, the property in them remained in the seller until his agent, whom he sent to look out for the cattle when shipped by railroad, found the buyer and turned the cattle over to him.

3. SALES—BUYER BY ACCEPTING GOODS WAIVES FAILURE TO DELIVER ACCORDING TO TERMS OF CONTRACT AND DAMAGED CONDITION.—Although the buyer of cattle was not bound to accept them where they were delivered in a damaged condition and at a place different from the one named in the contract, having done so, after an opportunity to inspect them, he waived vendor's failure to deliver according to the terms of the contract, and the damaged condition of the cattle on delivery, and was bound to pay the purchase price in the absence of fraud or concealment or breach of warranty.

APPEAL from a judgment of the Superior Court of the County of Yavapai.  John J. Sweeney, Judge. Judgment modified and affirmed.

### STATEMENT OF FACTS.

Plaintiff sued defendant for a balance of four hundred and ten dollars on purchase price of thirty-five

---

1.  On effect of premature delivery by seller to pass title to purchaser, see note in 31 L. R. A. (N. S.) 942.

2.  On effect of sale with particular description of kind or quality, see note in 35 L. R. A. (N. S.) 258.

Devon heifers and twelve cows, and sixteen dollars and sixteen cents, expenses of delivery.

Defendant admits in his answer that he purchased and agreed to pay for cattle as alleged, and, by way of counterclaim, he asserts the cattle, under the contract, were to be delivered to him or his agent at Temecula, California, that they were not delivered at that place, but, on the contrary, without any authority from him, plaintiff shipped the cattle to defendant in Arizona; that the car in which they were shipped was not properly bedded, or bedded in the usual and customary way, and that the cows were heavy with calf and in no condition for shipment; that seven of the cows gave birth to calves and that six of the cows died from the effects thereof, either in transit or shortly after their arrival at destination, and that all of the calves died except one; that on account of plaintiff's negligence in shipping the Devon heifers in an unbedded car, five of them were so badly bruised and broken in transit that, shortly after their arrival, they died from the effects of the journey.

Defendant claims damages as follows: Loss of six cows at agreed purchase price of $60 each; loss of five Devon heifers at agreed purchase price of $40 each; and six calves at $150.

Plaintiff replied to counterclaim denying any negligence or damage as alleged in the cross-complaint, but did not traverse the allegations therein as to shipping of cattle without authority, or failure to deliver to defendant at Temecula.

The case was tried to the court without a jury and judgment rendered in favor of plaintiff for the balance of the agreed purchase price, $410.

Messrs. O'Sullivan & Morgan, for Appellant.

Messrs. Clark & Clark, for Appellee.

ROSS, C. J. (After Stating the Facts as Above.)—There is little or no conflict in the evidence. Some time in June or July, 1916, plaintiff, a resident of San Diego county, California, wrote to defendant, who resides in Yavapai county, Arizona, offering to sell him thirty-five Devon heifers and some cows. Replying to plaintiff, July 13th, defendant wrote:

". . . I note your proposition in regard to the thirty-five heifer calves that you state will be about a year old in October. I will take those at $40 per head and whatever number of those twenty-five cows you mention that I can put in the same car with those heifers. Would wish to select the number out of the 25 head you mention at $60 per head. Would wish to have them calving or about to calve around about that time. Would want them delivered at Temecula station where we loaded the other lot, say between the first and middle of October, and as I expect to go over to San Diego about August 10th, I will call at your ranch and look them over and make the selection, as I don't think that I can get around there in October, as I may be compelled to go East again about that time, so would leave the shipping to yourself as I feel you would do what is right in that event. Now I am enclosing you my check on my bank here for $200 payable August 15th, or rather dated on that date. . . . If I should wish and you were in shape to hold them a month later than October 15th, I would pay you for pasture, but I do not think it will be necessary, so hope my proposition will be satisfactory. If you think it necessary when I call and look your cattle over, we can draw up a few lines of an agreement, but I think you and I understand each other fairly well by this time. . . . "

September 1st defendant went to plaintiff's ranch and saw the thirty-five Devon heifers and confirmed his letter of July 13th by stating he would take them. The cows were not selected or identified at that time, but it was agreed that they should be selected and appropriated to the contract by plaintiff at the time

of delivery. According to plaintiff's testimony, defendant had requested him to breed the cows, or select such as were bred, so that they would commence calving about the first of October. Defendant says plaintiff agreed to pick out cows that would calve the latter part of September and about the first of October so there would be no difficulty on the road, and to be careful to see that the car was well bedded before loading any cows heavy with calf. October 15th was tentatively agreed upon as the time for delivery of the cattle at Temecula, the nearest railway station to plaintiff's ranch. Plaintiff says defendant had instructed him to ship the cattle about October 15th from Temecula, when the latter was at his ranch. Plaintiff also says that defendant wanted him to send a man with the cattle, but it was finally agreed that defendant would send his own man to look after the cattle in shipment. Quoting plaintiff:

"They were to be delivered at Temecula at that time by me. The delivery of these cattle at Temecula was to be the consummation of this bargain. They were to be paid for at that time and place."

Plaintiff selected and gathered the cattle and drove them to Temecula October 15th, and on the 16th loaded and consigned them to defendant at Skull Valley, Arizona, and selected a man by the name of Steen as caretaker of the cattle while in transit. He says:

"There was no one there to take charge of them, so I sent my man with them."

October 10th defendant wrote plaintiff:

"I am sending a young man from Skull Valley to come back with the stock and will try to start him by the 13th, as soon as I get up there and give him instructions how to handle them after you get them loaded at Temecula. . . . The kid I am sending knows nothing about our deal and will have nothing to do

with them but help you drive them to Temecula and look after them on the road. You had better get the whole outfit shaped up so that they will be ready to go the next morning after he gets there. I will try to have him there by the 15th, the latest the 16th. It may be I can get to your place by the 14th. I will do the best I can. I will send you draft to reach you before you ship. I will be detained here (Phoenix) till the evening of the 12th and then go North and send shipper, so get them all together in a lot to themselves.''

The cattle were unloaded at Skull Valley October 17th, of which defendant was notified by man in charge. Whereupon, under instructions from defendant they were reloaded and shipped in same car to Prescott, at which point they were delivered to and received by defendant on October 21st—except one cow which had died in transit at Barstow. Defendant paid the carriage charges to the railroad company, including $18 extra from Skull Valley to Prescott. October 21st defendant wrote plaintiff, complaining of loss of the cow in transit, claiming it was due to no bedding in car, and stating he had put in a bill against the railroad company and given Steen $10 on plaintiff's account and $10 for expenses, and $18.75 to buy a return ticket; that the cows looked pretty bad after the trip, but the heifers stood it all right and looked good, and stated he would send draft next week. November 16th, defendant wrote plaintiff from Phoenix stating he was called away to Kansas City the next morning after the cattle were unloaded in Prescott and before they left the railroad yard; that he had been informed by a neighbor that one of the cows died two days after reaching the ranch, and stated ''they undoubtedly were badly handled by both the railroad and shipper.'' In this letter he inclosed a draft for $1,500, and promised to send bal-

ance as soon as he got to Prescott, and asked for a statement from plaintiff.

It is in evidence that defendant and his employees inspected the cattle the following morning after their arrival in Prescott. Two of the employees testified that their condition was bad; that they were all skinned up and bruised, and some of them limped.

The defendant takes the position that he is entitled to recover from plaintiff the value of animals accepted by him that subsequently died as the result of their bad treatment in shipment. This depends upon the question of ownership of cattle during transit when it is claimed the injuries were inflicted. If the title did not pass to defendant until they were delivered to him in Arizona, any injury they sustained during transit would adhere to the ownership and fall upon the plaintiff. If the title to the cattle passed before the shipment and claimed injury, a different rule would be applicable. We think it is deducible from the evidence and admissions in pleadings that it was the intention of the parties: (1) That title to cattle should pass to defendant on delivery and payment of balance of purchase price, the two acts to be concurrent; (2) that plaintiff's duties and obligations should end with the loading of cattle and turning them over to defendant's shipper or representative; (3) that prior to or contemporaneously with the loading of cattle the defendant should receive them and take charge of and superintend their movement from California to Arizona; (4) that plaintiff had no authority from defendant to load and ship cattle in the absence of defendant or his representative to receive them.

The duty of delivery according to contract is an imperative one. A delivery by any other means or through any other agency than the one agreed upon entitles the vendee to repudiate the sale if he so elect,

and any loss or damage to the goods in transit in such circumstance is the vendor's. If the vendor would avoid these contingencies and possible comebacks, he must make his delivery in accordance with the terms of the contract. *McNeal* v. *Braun,* 53 N. J. L. 617, 26 Am. St. Rep. 441, 23 Atl. 687; *Gibson* v. *Inman Packet Co.,* 111 Ark. 521, Ann. Cas. 1916A, 1043, and note, 164 S. W. 280; *Leitner* v. *Cooper,* 9 Ga. App. 394, 71 S. E. 596; *Clauss-Shear Co.* v. *Alabama Paper Supply Co.,* 1 Ala. App. 664, 56 South. 49; *Arons* v. *Cummings,* 107 Me. 19, 31 L. R. A. (N. S.) 942, 78 Atl. 98. In the last case it is said:

"If the delivery or shipment is not made in accordance with the terms of the order or the stipulation in the contract between the parties, it is not considered that the delivery is made to the buyer's agent and the title and risk remain in the seller."

Since the delivery was not effected at Temecula, a condition precedent to passing title under the contract, it is apparent the property in cattle remained in plaintiff until his agent, Steen, found defendant and turned the cattle over to him in Arizona. Any loss or damage to cattle in transit by reason of the negligence of his man, Steen, or the railroad company, or otherwise, was his and not the defendant's. The defendant was entitled to receive them in Temecula and could have refused to accept them at any other place. He did not have to accept them, especially in a damaged condition and at a place different from the one named in the contract. Having done so, however, after an opportunity to inspect the cattle, in the absence of fraud or concealment, or breach of warranty, the law definitely fixes his status as having waived the vendor's failure to deliver according to the terms of the contract, and requires that he pay the price agreed upon. The general rule is stated in 23 R. C. L. 1439, section 264, as follows:

"According to the view taken in most cases, if the buyer, under an executory contract of sale, has had opportunity to examine the article and accepts it as fulfilling the contract, he is concluded by such acceptance and cannot afterwards, in the absence of fraud or express warranty, allege its defective quality." *Springfield Shingle Co.* v. *Edgecomb Mill Co.*, 52 Wash. 620, 35 L. R. A. (N. S.) 258, and note B, p. 280, 101 Pac. 233.

It is a plain case of tender and acceptance of the cattle in their injured and damaged condition as a fulfillment of the contract. As was said in *Brown* v. *Davidson,* 42 Okl. 598, 142 Pac. 387, in which a similar question was involved:

"Upon receipt of the horse if it was found that he did not come up to the description given of him, defendant could have so advised the seller, repudiating the sale, and demanded the advance payment back. If what he had paid out had been returned to him and the colt taken back, he would have been unhurt; if it had not, and he could prove his contention that it was not such animal as he had contracted for, he could have recouped his damages. But with full knowledge he chose to affirm the sale and renew his promise to complete the payment when due."

The counterclaim being for the negligent injury of cattle before defendant became their owner, and not for deceit, fraud, or breach of warranty in the sale, it must of necessity fail. *McQuaid* v. *Ross,* 85 Wis. 492, 39 Am. St. Rep. 864, 22 L. R. A. 187, 55 N. W. 705; *Hanson* v. *Hartse,* 70 Minn. 282, 68 Am. St. Rep. 527, 73 N. W. 163; *Dorsey* v. *Watkins* (C. C.), 151 Fed. 340. These cases hold that the buyer of cattle who has had an opportunity to inspect them and has knowledge as to their condition at the time of acceptance as good as that of the seller cannot repudiate the contract except for fraud or breach of warranty.

The plaintiff recovered judgment on the basis that he had delivered twelve cows to defendant, whereas he had delivered only eleven cows. He was not entitled to recover for the cow that died in transit and before delivery. The judgment was for $60 too much. The case is accordingly remanded, with directions that the judgment be modified by deducting therefrom $60 and, as modified, it is affirmed, with costs of this appeal to defendant.

BAKER and McALISTER, JJ., concur.